UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

SEMINOLE TRIBE OF FLORIDA,
a Federally recognized Indian Tribe,

       Plaintiff,

v.

LEON BIEGALSKI, AS EXECUTIVE DIRECTOR
OF THE DEPARTMENT OF REVENUE,
STATE OF FLORIDA

       Defendant.

_____/

## COMPLAINT

Plaintiff, SEMINOLE TRIBE OF FLORIDA (the "Tribe"), a Federally recognized Indian

Tribe, hereby sues Defendant, LEON BIEGALSKI ("Executive Director"), in his official

capacity as Executive Director of the Department of Revenue, State of Florida ("Department"),

who is charged with the enforcement and collection of Florida's gross receipts tax on utilities

services pursuant to Fla. Stat. § 203.01, *et seq*. ("Utilities Tax").

The Tribe demands (1) a judgment declaring that the application of Utilities Tax to

utilities services, specifically electricity, that the Tribe uses on its reservations and other property

held in trust for its benefit by the United States of America (collectively, "Tribal Land") in the

conduct of any activity that (i) is exclusively and pervasively regulated by federal law; (ii)

constitutes the exercise of its sovereign functions; and/or (iii) constitutes the use of its Tribal

Land, is prohibited by federal law; and (2) a permanent injunction enjoining the further

imposition or collection of Utilities Tax on utilities services used to conduct any of those activities.

**PARTIES**

1.      The Tribe is, and at all times material hereto was, a Federally recognized Indian Tribe with its governing body and its principal domicile in Broward County, Florida.

2.      The Executive Director is the official of the Department directly responsible for enforcing and collecting Florida's Utilities Tax that is imposed pursuant to Fla. Stat. § 203.01, *et seq.* The Department is the agency of the State of Florida (the "State") responsible, *inter alia*, for the collection and enforcement of tax revenues collected or paid pursuant to Fla. Stat. § 203.01, *et seq*.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, "Federal Question", and 28 U.S.C. § 1362, "Indian Tribes."  The Tribe asserts claims arising under the United States Constitution and laws of the United States, including the Indian Commerce Clause (U.S. Const. Art. 1, § 8, cl. 3).

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events (*i.e.*, the provision of utilities services and the imposition and/or collection of Utilities Tax) giving rise to the claims occurred in this District.

**GENERAL ALLEGATIONS**

5.      The Tribe is an organized Indian tribe that is recognized by the United States Secretary of the Interior with a governing body as defined in § 16 of the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 461 *et seq*., and a sovereign Native American tribal government whose headquarters is located at 6300 Stirling Road, Hollywood, Florida 33024.

6.     The Tribe's Tribal Land consists of Indian reservations in Hollywood, Tampa, Immokalee, Brighton, and Big Cypress, Florida, and other property that is held in trust for its benefit by the United States of America, including property in Coconut Creek, Florida, all of which constitutes "Indian land" and "Indian country" (as those terms are used in federal law).

## UTILITIES TAX – FLA. STAT. § 203.01

7.     Fla. Stat. § 203.01 imposes a tax equal to 2.5% of the gross receipts that a utility service provider collects from a retail consumer for the sale and delivery of utilities services, including electricity, to the retail consumer in the State ("Utilities Tax").

8.     The utility service providers collect the Utilities Tax from the Tribe as the retail consumer of such utilities services by adding it to the invoice as a component of the charges for such utilities services.  The utility service providers have collected, and continue to collect, the Utilities Tax on the utilities services that are provided to the Tribe on Tribal Land, including electricity that the Tribe uses in connection with activities that (i) are exclusively and pervasively regulated by federal law; (ii) constitute the exercise of its functions as a sovereign government; and/or (iii) constitute the use of Tribal Land.

## PRIOR LITIGATION

9.     On October 30, 2012, the Tribe sued then Executive Director of the Department, Marshall Stranburg, in this Court for a declaration that the application of Utilities Tax to any utilities services delivered to Tribe on Tribal Land was categorically barred by the Indian Commerce Clause (U.S. Const. Art. I, § 8, cl. 3) on the grounds that the legal incidence of the tax rested with the Tribe as the consumer. *Seminole Tribe of Fla. v. Florida*, 49 F. Supp. 3d 1095 (S.D. Fla. 2014).

10.     The Tribe contended, in the alternative, that, if the legal incidence of the Utilities Tax were held to rest with the service provider, the application of Utilities Tax to utilities services that the Tribe used on Tribal Land in connection with the activities that are exclusively and pervasively regulated by law, including the provision of essential governmental services, leasing of Tribal Land and Indian gaming, is preempted by federal law.

11.     This Court agreed with the Tribe that the legal incidence of the Utilities Tax rested with the Tribe as the retail consumer and held that the application of the Utilities Tax to any utilities services sold and delivered to the Tribe on Tribal Land was categorically barred by the Indian Commerce Clause, regardless of the purposes for which the utilities services were used.

12.     Then Executive Director Stranburg appealed this Court's decision to the Eleventh Circuit Court of Appeals, who reversed this Court's holding that the legal incidence of the Utilities Tax rests with the Tribe. The Eleventh Circuit held that federal law does not generally preempt the tax on all utilities services used by the Tribe on Tribal Lands, but acknowledged that it might preempt Utilities Tax on utilities services that the Tribe uses to conduct specific activities, such police and fire protection, land leasing, and gaming. The Eleventh Circuit said that the record in that particular case was insufficient to demonstrate that the federal statutes represent the exclusive and pervasive regulation of those activities and that it was unable to conduct a particularized inquiry with respect to the application of the Utilities Tax to utilities services used to conduct each such activity. The Eleventh Circuit remanded the case to this Court for proceedings consistent with its opinion. *Seminole Tribe of Florida v. Stranburg*, 799 F. 3d 1324 (11th Cir. 2015).

13.     On remand, the Tribe asked this Court to conduct the particularized inquiry to determine whether the federal regulation of each of the various activities in which the Tribe uses utilities services is exclusive and pervasive, but the Court declined to do so in the context of that case.

14.     The issues of whether the activities in which the Tribe uses utilities services (i) are exclusively and pervasively regulated by federal law; (ii) constitute the exercise of its sovereign functions; and/or (iii) constitute the use of its Tribal Land, have never been addressed by any Court. Consequently, no Court has determined whether the application of the Utilities Tax to utilities services that the Tribe uses on Tribal Land to conduct the specific activities described in Counts I – XIV, below, is prohibited by federal law.

## APPLICABLE FEDERAL LAW

15.     A state tax on activities conducted on Tribal Land is preempted by operation of federal law if it interferes, or is incompatible, with the federal and tribal interests reflected in that federal law, unless the state's interests at stake are sufficient to justify the assertion of its taxing authority. *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324 (1983); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136 (1980).

16.     When the state tax burdens an activity conducted on Tribal Land that is exclusively and pervasively regulated by federal law, the tax can be justified only if it furthers some legitimate regulatory interest of the state or is narrowly tailored to compensate the state for services it specifically provides in connection with the particular activity that bears the tax. The tax cannot be justified by the state's generalized need for tax revenues.  *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136 (1980); *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324 (1983).

17.     The Utilities Tax serves no legitimate regulatory interest of the State and is not narrowly tailored to compensate the State for services it specifically provides in connection with any activity conducted on Tribal Land. The Utilities Tax is a tax of general application that funds services that the State provides off Tribal Lands to its residents in general.

18.     Independently of federal preemption, any state tax that interferes with the Tribe's ability to exercise its sovereign functions is prohibited by federal law. *Ramah Navajo School Board, Inc v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982).

19.     Independently of federal preemption and tribal sovereignty, any state tax that burdens an Indian Tribe's use of its Tribal Land is prohibited by 25 U.S.C. §465. *Seminole Tribe of Florida v. Stranburg,* 799 F. 3d 1324 (11th Cir. 2015); *Seminole Tribe of Florida v. Stranburg*, 49 F. Supp. 3d at 1095 (S.D. Fla. 2014).

## COUNT I

### LAW ENFORCEMENT ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

20.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

21.     The Tribe conducts law enforcement activities on Tribal Land, including operating its own police force and court system.  The Tribe uses utilities services to conduct these activities. For example, the Tribe uses electricity to air condition, light and power the equipment in the governmental offices in which these activities are conducted and administered. Electicity is also used to light the buildings and lots in which the vehicles, including police cars, used to conduct this activity are stored and maintained. It is also used to power pumps for fueling such vehicles. The Tribe also uses electricity for traffic and street lights throughout its

reservations. It also uses electricity to power security gates at many entrances to and within its Tribal Land.

22.     The Tribe's law enforcement activities, and the use, maintenance and operation of its law enforcement facilities, are exclusively and pervasively regulated by federal law, including but not limited to, the Indian Law Enforcement Reform Act, 25 U.S.C. §§ 2801-2815 (Chapter 30); the Indian Tribal Justice Act, 25 U.S.C. §§ 3601-3631 (Chapter 38); the Indian Tribal Justice Technical and Legal Assistance Act of 2000, 25 U.S.C. §§ 3651-3682 (Chapter 38A); and Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450-458ddd-2; and 25 C.F.R. Parts 900 and 1000 (with respect to funding law enforcement activities under the Indian Self-Determination and Education Assistance Act as amended by the and Tribal Self-Government Act); and the Snyder Act, 25 U.S.C. § 13 (relating to funding for police officers). In addition, the Tribe is receiving federal grants for law enforcement activities. Each grant subjects the Tribe's law enforcement activities to even more federal control, supervision, oversight and regulation.

23.     The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's law enforcement activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

24.     The State provides no services in connection with the Tribe's law enforcement activities.

25.     As applied to utilities services that the Tribe uses to conduct law enforcement activities, the Utilities Tax is preempted by federal law.

26.     The Tribe's law enforcement activities are sovereign functions.

27.     As applied to utilities services that the Tribe uses to conduct law enforcement activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

28.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct law enforcement activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

29.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct law enforcement activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.     Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct law enforcement activities is prohibited by federal law;

b.     Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct law enforcement activities; and

c.     Ordering such other relief as the Court deems appropriate.

**COUNT II**

**EDUCATION ACTIVITIES**
**DECLARATORY AND INJUNCTIVE RELIEF**

30.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

31.     The Tribe conducts education activities on Tribal Land, including operating its own schools and learning facilities. The Tribe uses utilities services to conduct these activities. For example, it uses electricity to air condition, light and power the equipment in the schools, learning facilities  and governmental offices in which these activities are conducted and administered.  Electricity is also used to light the buildings and lots in which the vehicles, including school buses, used to conduct these activities are stored and maintained. It is also used to power pumps for fueling such vehicles.

32.     The Tribe's education activities are exclusively and pervasively regulated by federal law, including, but not limited to, the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450-458ddd-2, including the Johnson-O'Malley Act, 25 U.S.C. §§  452-457;  25 U.S.C. §§ 271-295 (Chapter 7); 25 C.F.R. Parts 30-47, 273, 900 and 1000 (with respect to funding education activities under the Indian Self-Determination and Education Assistance Act as amended by the and Tribal Self-Government Act and Johnson-O'Malley Act); the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 6391 *et seq*.; the No Child Left Behind Act of 2001, 20 U.S.C. Chapter 70 (specifically §§ 7401-7492, relating to Indian Education); the Tribally Controlled Schools Act of 1988, 25 U.S.C. §§ 2501- 2511 (Chapter 27) (relating to federal grants for funding education activities); the Native American Education Improvement Act of 2001, 25 U.S.C. §§ 2000 – 2021 (Chapter 22)*;* the Tribally Controlled Colleges and Universities Assistance Act of 1978, 25 U.S.C. §§ 1801 – 1864 (Chapter 20); the Snyder Act, 25 U.S.C §13 (relating to funding of education related activities);

the Carl D. Perkins Career and Technical Education Act of 2006, 20 U.S.C. §§ 2301-2414 (Chapter 44); 29 U.S.C. § 3221; and 25 C.F.R. Part 26 (relating to job placement and training programs). *See, Ramah Navajo School Board, Inc v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982), in which the Court held that the federal regulation of Indian education activities is exclusive and pervasive and that a state tax that burdens the activity is therefore preempted. In addition, the Tribe receives grants pursuant to the Johnson-O'Malley Act for its educational activities. It also receives grants for its community learning centers, adult education, its higher education program, and its Ahfachkee Day School. Each grant subjects the Tribe's educational activities to even more extensive federal control, oversight, supervision and regulation.

33.    The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's education activities, including  tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

34.    The State provides no services in connection with the Tribe's education activities.

35.    As applied to utilities services that the Tribe uses to conduct education activities, the Utilities Tax is preempted by federal law.

36.    The Tribe's education activities are sovereign functions.

37.    As applied to utilities services that the Tribe uses to conduct education activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

38.    The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct education activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals

with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

39.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct education activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.      Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct education activities is prohibited by federal law;

b.      Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct its education activities; and

c.      Ordering such other relief as the Court deems appropriate.

## COUNT III

### MEDICAL, HEALTH AND FIRE RESCUE SERVICES
### DECLARATORY AND INJUNCTIVE RELIEF

40.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

41.     The Tribe conducts medical, health and fire rescue activities on Tribal Land, including operating its own medical clinics, ambulances and fire trucks. It uses utilities services to conduct these activities. For example, the Tribe uses electricity to air condition, light and power the equipment in the medical clinics and fire stations in which these activities are

conducted and in the governmental offices in which these activities are administered. Electricity is also used to light and power the buildings and in which the equipment and vehicles, including ambulances and fire trucks, used to conduct these activities are stored and maintained. Electricity is also used to power pumps for fueling such vehicles. Electricity is also used to recharge emergency vehicles and support systems, including fire and medical equipment, at fire stations, emergency management command centers and communication trailers. Electricity is also used to power fire alarms and life safety systems in facilities and businesses on Tribal Land.

42.     The Tribe's medical, health and fire rescue activities are exclusively and pervasively regulated by federal law, including, but not limited to, the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450-458ddd-2; 25 C.F.R. Parts 900 and 1000 (with respect to funding medical, health and fire rescue activities under the Indian Self-Determination and Education Assistance Act as amended by the and Tribal Self-Government Act); the Indian Health Care Improvement Reauthorization and Extension Act of 2009, 25 U.S.C. §§ 1601-1683 (Chapter 18); 42 C.F.R. Parts 136 - 137; the Snyder Act of 1921, 25 U.S.C §13 (relating to funding for health-related activities); and 42 U.S.C. §§ 3032g and 3057-3057f, 3057 l-n.  In addition, the Tribe receives federal grants under the Indian Health Service Health Management Development Program, the Demonstration Projects For Indian Health, the Indian Self-Determination and Education Assitance Act, and the Public Health Emergency Preparedness Program for use in its medical, health and fire rescue activities. Each grant subjects the Tribe's medical, health and fire rescue activities to even more extensive federal control, oversight, supervision and regulation.

43.     The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's medical, health and fire rescue

activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

44.      The State provides no services in connection with the Tribe's medical, health and fire rescue activities.

45.      As applied to utilities services that the Tribe uses to conduct medical, health and fire rescue activities, the Utilities Tax is preempted by federal law.

46.      The Tribe's medical, health and fire rescue activities are sovereign functions.

47.      As applied to utilities services that the Tribe uses to conduct medical, health and fire rescue activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

48.      The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct medical, health and fire rescue activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

49.      The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct medical, health and fire rescue activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.      Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct medical, health and fire rescue activities is prohibited by federal law;

b.      Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct medical, health and fire rescue activities; and

c.      Ordering such other relief as the Court deems appropriate.

## COUNT IV

**FAMILY AND YOUTH COUNSELING ACTIVITIES
DECLARATORY AND INJUNCTIVE RELIEF**

50.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

51.     The Tribe conducts family and youth counseling activities on Tribal Land, including operating its own community centers, recreational centers and facilities.  It uses utilities services to conduct these activities. For example, it uses electricity to air condition, light and power the equipment in the facilities and government offices in which these activities are conducted and administered. Electricity is also used to light the buildings and lots in which the equipment and vehicles used to conduct these activities are stored and maintained.

52.     The Tribe's family and youth counseling activities are exclusively and pervasively regulated by federal law, including but not limited to, the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450-458ddd-2; 25 C.F.R. Parts 900 and 1000 (with respect to funding family and youth counseling activities under the Indian Self-Determination and Education Assistance Act as amended by the and Tribal Self-Government Act); the Indian Alcohol and Substance Abuse Prevention and Treatment Act of 1986, 25 U.S.C.

§ 2401- 2455 (Chapter 26); the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901-1963 (Chapter 21); 25 C.F.R. Part 23 (relating to the Indian Child Welfare Act); the Indian Child Protection and Family Violence Prevention Act, 25 U.S.C. § 3201-3211 (Chapter 34); 25 C.F.R. Part 63 (relating to the Indian Child Protection and Family Violence Prevention Act); 25 C.F.R. Part 20 (relating to financial assistance and social services programs); 42 C.F.R. Parts 136-137; the Indian Health Care Improvement Reauthorization and Extension Act of 2009, 25 U.S.C. §§ 1601-1683 (Chapter 18) (as it specifically relates to behavior health and psychological well being, 25 U.S.C. § 1603(11)(G), and behavior health programs, 25 U.S.C. §§ 1665-1677e);  25 U.S.C. § 1621n (relating to grants for mental health and substance abuse programs); 25 U.S.C. § 1602(7) (relating to funding for health programs and facilities). In addition, the Tribe receives federal grants to operate its child welfare and social services programs. Each grant subjects the Tribe's family and youth counseling activities to even more extensive federal control, oversight, supervision and regulation.

53.     The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's family and youth counseling activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

54.     The State provides no services in connection with the Tribe's family and youth counseling activities.

55.     As applied to utilities services that the Tribe uses to conduct family and youth counseling activities, the Utilities Tax is preempted by federal law.

56.     The Tribe's family and youth counseling activities are sovereign functions.

57.     As applied to utilities services that the Tribe uses to conduct family and youth counseling activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

58.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct family and youth counseling activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

59.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct family and youth counseling activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.     Declaring that the application of the Utilities Tax to utilities services that the Tribe uses in connection with its family and youth counseling activities is prohibited by federal law;

b.     Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses in connection with its family and youth counseling activities; and

c.     Ordering such other relief as the Court deems appropriate.

## COUNT V

### WATER AND SANITATION MANAGEMENT ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

60.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

61.     The Tribe conducts water and sanitation management activities on Tribal Land, including operating its own utility systems, wells, water treatment facilities, sanitation facilities, water mains, water pumps, lift stations and pumping stations.  It uses utilities services to conduct these activities. For example, it uses electricity to power the equipment that is required to conduct these activities. Electricity is also used to air condition, light and power the facilities and government offices in which these activities are conducted and administered. Electricity is also used to light the buildings and lots in which the equipment and vehicles that are used to conduct these activities are stored and maintained. It is also used to power pumps for fueling such vehicles.

62.     The Tribe's water and sanitation management activities are exclusively and pervasively regulated by federal law including, but not limited to, the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450-458ddd-2; 25 C.F.R. Parts 900 and 1000 (with respect to funding water and sanitation management activities under the Indian Self-Determination and Education Assistance Act as amended by the and Tribal Self-Government Act); the Indian Health Care Improvement Act, 25 U.S.C. §§1601-1683 (Chapter 18); the Indian Sanitation Facilities Act of 1959, 42 U.S.C. §§ 2004a - 2005; and the Snyder Act, 25 U.S.C. § 13 (relating to funding for water supplies). In addition, the Tribe receives federal grants from the Department of Health and Human Services and Indian Health Services for the construction of water mains, wells, and wastewater facilities on the Tribal Land. The Tribe also receives a grant

from the Bureau of Indian Affairs to operate and administer a water resources program. Such grant subjects the Tribe's water and sanitation management activities to even more extensive federal control, oversight, supervision and regulation.

63.     The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's water and sanitation managment activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

64.     The State provides no services in connection with the Tribe's water and sanitation management activities.

65.     As applied to utilities services that the Tribe uses to conduct water and sanitation management activities, the Utilities Tax is preempted by federal law.

66.     The Tribe's water and sanitation management activities are sovereign functions.

67.     As applied to utilities services that the Tribe uses to conduct water and sanitation management activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

68.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct water and sanitation management activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.

Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

69.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct water and sanitation management activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.     Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct water and sanitation management activities is prohibited by federal law;

b.     Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct water and sanitation management activities; and

c     Ordering such other relief as the Court deems appropriate.

## COUNT VI

### ROAD CONSTRUCTION AND MAINTENANCE ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

70.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

71.     The Tribe conducts road construction and maintenance activities on Tribal Land. It uses utilities services to conduct these activities. For example, it uses electricity to air condition, light and power the equipment in the governmental offices in which these activities are administered.  Electricity is also used to light the buildings and lots in which the equipment

and vehicles used to conduct these activities are stored and maintained. It is also used to power pumps for fueling such vehicles.

72.     The Tribe's road construction and maintenance activities are exclusively and pervasively regulated by federal law including, but not limited to, 25 U.S.C. §§ 311 – 329 (Chapter 8); 25 C.F.R. Parts 169, 170 and 181. In addition, the Tribe receives grants for various road construction projects on Tribal Land. Each grant subjects the Tribe's road construction and maintenance activities to even more extensive federal control, oversight, supervision and regulation.

73.     The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's road construction and maintenance activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

74.     The State provides no services in connection with the Tribe's road construction and maintenance activities.

75.     As applied to utilities services that the Tribe uses to conduct road construction and maintenance activities, the Utilities Tax is preempted by federal law.

76.     The Tribe's road construction and maintenance activities are sovereign functions.

77.     As applied to utilities services that the Tribe uses to conduct road construction and maintenance activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

78.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct road construction and maintenance activities is prohibited by federal law because it has an actual, present and practical need for the

declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax. Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

79.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct road construction and maintenance activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.      Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct road construction and maintenance activities is prohibited by federal law;

b.      Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct road construction and maintenance activities; and

c.      Ordering such other relief as the Court deems appropriate.

## COUNT VII

### HOUSING ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

80.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

81.     The Tribe conducts housing activities on Tribal Land, including providing low cost housing for its members. It uses utilities services to conduct these activities. For example, it uses electricity to power the equipment that is used to construct housing units. Electricity is also used to air condition, light and power the equipment in the governmental offices in which these activities are administered. Electricity is also used to light and power the buildings and lots in which the equipment and vehicles used to conduct these activities are stored and maintained. It is also used to power pumps for fueling such vehicles.

82.     The Tribe's housing activities are exclusively and pervasively regulated by federal law including, but not limited to, the Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. § 4101 – 4243 (Chapter 43); 25 C.F.R. Part 256 (relating to the Housing Improvement Program); 24 C.F.R. Part 1000; the National Housing Act, 12 U.S.C. § 1701, *et seq.;* 12 U.S.C. § 1715z-13 (relating to mortgage insurance on Indian reservations); 12 U.S.C. § 1715z-13a (relating to loan guarantees for Indian housing). In addition, the Tribe receives federal grants from the United States Department of Housing and Urban Development to provide housing to tribal members. Each grant subjects the Tribe's housing activities to even more extensive federal control, oversight, supervision and regulation.

83.     The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's housing activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

84.     The State provides no services in connection with the Tribe's housing activities.

85.     As applied to utilities services that the Tribe uses to conduct housing activities, the Utilities Tax is preempted by federal law.

86.     The Tribe's housing activities are sovereign functions.

87.     As applied to utilities services that the Tribe uses to conduct housing activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

88.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct housing activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

89.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct housing activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.     Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct housing activities is prohibited by federal law;

b.     Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct housing activities; and

c.     Ordering such other relief as the Court deems appropriate.

## COUNT VIII

### CULTURE PRESERVATION ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

90.     The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

91.     The Tribe conducts culture preservation activities on Tribal Land, including operating its own museum in which its historic artifacts are preserved and displayed.  It also maintains cultural centers, memorials, monuments,  tribal historic sites and cultural rodeo sites. Its culture department conducts classes in traditional Seminole crafts including sewing, patchwork, beadwork, basket weaving, wood carving and doll making.  It also teaches classes on Native languages and Seminole traditions, culture and heritage.  It also teaches classes on hunting, fishing, preparing and preserving game meats and cooking.  It also provides traditional Seminole bereavement services. It uses utilities services to conduct these activities. For example, it  uses electricity to air condition, light and power the equipment used in the museum, cultural centers and governmental offices in which these activities are conducted and administered. Electricity is also used to light the Tribe's memorials, monuments and historic sites.

92.     The Tribe's culture preservation activities are exclusively and pervasively regulated by federal law including, but not limited to, the National Historic Preservation Act, 54 U.S.C. § 300101-320303; the American Indian, Alaska Native, and Native Hawaiian Culture and Art Development Act, 20 U.S.C. §§ 4401-4426; 25 C.F.R. Parts 262 and 265; and 36 C.F.R. Part 800. In addition, the Tribe receives grants from the United States Department of the Interior and the National Park Service to preserve and protect its culture and historic resources. Each grant subjects the Tribe's culture preservation activities to even more extensive federal control, oversight, supervision and regulation.

93.     The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's culture preservation activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

94.     The State provides no services in connection with the Tribe's culture preservation activities.

95.     As applied to utilities services that the Tribe uses to conduct culture preservation activities, the Utilities Tax is preempted by federal law.

96.     The Tribe's culture preservation activities are sovereign functions.

97.     As applied to utilities services that the Tribe uses to conduct culture preservation activities, the Utilities Tax interferes with the Tribe's ability to exercise its sovereign functions by increasing the cost of exercising those functions.

98.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct culture preservation activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

99.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct culture preservation activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.    Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct culture preservation activities is prohibited by federal law;

b.    Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct culture preservation activities; and

c.    Ordering such other relief as the Court deems appropriate.

## COUNT IX

### LEASING ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

100.    The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

101.    The Tribe leases Tribal Land. It uses utilities services to conduct these leasing activities. For example, the Tribe has space that is available for lease in its entertainment facilities. Until that space is actually leased, the Tribe uses electricity to air condition, light and otherwise maintain that space in leasable condition.  In some cases, it leases space in its entertainment facilities that is not closed off by walls or doors. In those circumstances, the Tribe pays for all of the electricity that is used to air condition and light that space. Electricity is also used to air condition, light and power the equipment in the governmental offices in which the leasing activities are conducted.

102.    The Tribe's leasing activities are exclusively and pervasively regulated by federal law including, but not limited to, the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*; 25 U.S.C. § 415; 25 C.F.R. Part 162. *See, Seminole Tribe of Florida v. Stranburg,* 799 F. 3d

1324 (11th Cir. 2015); *Seminole Tribe of Florida v. Stranburg*, 49 F. Supp. 3d at 1095 (S.D. Fla. 2014), which held that the federal regulation of the leasing of Tribal Land is exclusive and pervasive, and that state taxation of the activity is therefore preempted.

103.   The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's leasing activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

104.   The State provides no services in connection with the Tribe's leasing activities.

105.   As applied to utilities services that the Tribe uses to conduct leasing activities, the Utilities Tax is preempted by federal law.

106.   Leasing constitutes a "use" of Tribal Land.  The Utilities Tax, as applied to electricity that the Tribe uses in connection with its leasing activities, is a prohibited tax on the Tribe's use of its Tribal Land.

107.   The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct leasing activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

108.    The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct leasing activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.    Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct leasing activities is prohibited by federal law;

b.    Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct leasing activities; and

c.    Ordering such other relief as the Court deems appropriate.

## COUNT X

### FORESTRY AND WILDLIFE MANAGEMENT ACTIVITIES DECLARATORY AND INJUNCTIVE RELIEF

109.    The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

110.    The Tribe conducts forestry and wildlife managment activities on Tribal Land. It uses utilities to conduct these activities. For example, it uses electricity to air condition, light and power the equipment in the governmental offices in which these activities are administered. Electricity is also used to light the buildings and lots in which the equipment and vehicles that are used to conduct these activities are stored and maintained. It is also used to power pumps for fueling such vehicles.

111.    The Tribe's forestry and wildlife managment activities are exclusively and pervasively regulated by federal law including, but not limited to, the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*; the National Indian Forest Resources Management Act, 25

U.S.C. §§ 3101-3120 (Chapter 33); 25 U.S.C. § § 406 and 407 (relating to the sale of timber from Tribal Land); 25 C.F.R. Part 163; 18 U.S.C. §§ 1853 (relating to unlawful cutting of trees from a tribal forest), 1855 and 1856 (relating to setting fires in tribal forests); 25 U.S.C. § 3106 (relating to trespasses on tribal forests);  25 U.S.C. § 3107 (relating to sale of tribal forestry products);  25 U.S.C. § 3115(a)(1)(C) (relating to cooperative agreements with the Department of the Interior for Indian foresty protection, including fire protection); and the Endangered Species Act of 1973, 16 U.S.C. § 1531, *et seq. See, White Mountain Apache Tribe v. Bracker,* 448 U.S. 136 (1980), in which the Court held that the federal regulation of Indian forestry activities was exclusive and pervasive and that the state tax on fuel used to conduct the activity was therefore preempted. In addition, the Tribe currently receives federal grants for its forestry, wildfire and wildlife management programs. Each grant subjects the Tribe's forestry and wildlife management activities to even more extensive federal control, oversight, supervision and regulation.

112.    The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's forestry and wildlife managment activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

113.    The State provides no services in connection with the Tribe's forestry and wildlife managment activities.

114.    As applied to utilities services that the Tribe uses to conduct forestry and wildlife managment activities, the Utilities Tax is preempted by federal law.

115.     Forestry and wildlife management is a "use" of the Tribe's Tribal Land.   The Utilities Tax, as applied to electricity that the Tribe uses in connection with its forestry and wildlife management activities is a prohibited tax on the Tribe's use of its Tribal Land.

116.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct forestry and wildlife managment activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax. Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

117.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct forestry and wildlife managment activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.     Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct forestry and wildlife managment activities is prohibited by federal law;

b.     Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct forestry and wildlife managment activities; and

c.     Ordering such other relief as the Court deems appropriate.

## COUNT XI

### AGRICULTURAL AND LIVESTOCK GRAZING ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

118.    The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

119.    The Tribe conducts agricultural and livestock grazing activities on Tribal Land. It uses utilities services to conduct these activities. For example, it uses electricity to air condition, light and power the equipment in the governmental offices in which these activities are administered. Electricity is also used to light and power the buildings and lots in which the equipment and vehicles that are used to conduct these activities are stored and maintained. It is also used to power pumps for fueling such vehicles.

120.    The Tribe's agricultural and livestock grazing activities are exclusively and pervasively regulated by federal law including, but not limited to, the American Indian Agricultural Resource Management Act, 25 U.S.C. §§ 3701-3746 (Chapter 39); 25 C.F.R. Parts 159, 166 and 171; and the Indian Reorganization Act, 25 U.S.C. § 461, *et seq*. In addition, the Tribe receives federal grants relating to its agricultural activities, including for soil analysis. Each grant subjects the Tribe's agricultural and livestock grazing activities to even more federal control, oversight, supervision, and regulation.

121.    The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's agricultural and livestock grazing activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

122.    The State provides no services in connection with the Tribe's agricultural and livestock grazing activities.

123.    As applied to utilities services that the Tribe uses to conduct agricultural and livestock grazing activities, the Utilities Tax is preempted by federal law.

124.    In addition, agricultural and livestock grazing is a "use" of Tribal Land.  The Utilities Tax, as applied to electricity that the Tribe uses in connection with its agricultural and livestock grazing activities, is a prohibited tax on the Tribe's use of its Tribal Land.

125.    The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct agricultural and livestock grazing activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax. Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

126.    The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct agricultural and livestock grazing activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.    Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct agricultural and livestock grazing activities is prohibited by federal law;

b. Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct agricultural and livestock grazing activities; and

c. Ordering such other relief as the Court deems appropriate.

## COUNT XII

**ROCK MINING ACTIVITIES**
**DECLARATORY AND INJUNCTIVE RELIEF**

127. The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

128. The Tribe conducts rock mining activities on Tribal Land. Much of the rock it mines is used in its road contruction and maintenance activities (Count VI, above). It uses utilities services to conduct these activities. For example, it uses electricity to light, air condition and power the equipment in the governmental offices in which these activities are administered. Electricity is also used to light and power the buildings and lots in which the equipment and vehicles that are used to conduct these activities are stored and maintained. It is also used to power pumps for fueling such vehicles.

129. The Tribe's rock mining activities are exclusively and pervasively regulated by federal law including, but not limited to, 25 U.S.C. §§2101-2108 (Chapter 23) and 25 C.F.R. Part 216.

130. The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's rock mining activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

131.    The State provides no services in connection with the Tribe's rock mining activities.

132.    As applied to utilities services that the Tribe uses to conduct rock mining activities, the Utilities Tax is preempted by federal law.

133.    In addition, rock mining constitutes a use of Tribal Land.  The Utilities Tax, as applied to electricity that the Tribe uses in connection with its rock mining activities is a prohibited tax on the Tribe's use of its Tribal Land.

134.    The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct rock mining activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

135.    The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct rock mining activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.    Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct rock mining activities is prohibited by federal law;

b.      Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct rock mining activities; and

c.      Ordering such other relief as the Court deems appropriate.

## COUNT XIII

### INDIAN GAMING ACTIVITIES
### DECLARATORY AND INJUNCTIVE RELIEF

136.    The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

137.    The Tribe conducts Indian gaming activities on Tribal Land, including operating its own casinos. It uses utilities services to conduct these activities. For example, it uses electricity to air condition, light and power equipment, including slot machines, located in the casinos in which this activity is conducted. Electricity is also used to air condition, light and power the equipment in the governmental offices in which this activity is administered.

138.    The Tribe's gaimg activities are exclusively and pervasively regulated by federal law including, but not limited to, the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (Chapter 29); 25 C.F.R. Parts 286-293, 501-585.

139.    The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's gaming activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

140.    The State provides no services in connection with the Tribe's gaming activities other than very limited monitoring rights under its Compact with the Tribe, all of which are designed to assure that the State receives its proper share of the gaming revenues, for which the State is compensated outside its tax system.

141.     As applied to utilities services that the Tribe uses to conduct gaming activities, the Utilities Tax is preempted by federal law.

142.     The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct gaming activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

143.     The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct gaming activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.     Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct gaming activities is prohibited by federal law;

b.     Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct gaming activities; and

c.     Ordering such other relief as the Court deems appropriate.

## COUNT XIV

**GAMING-RELATED ECONOMIC ACTIVITIES
DECLARATORY AND INJUNCTIVE RELIEF**

144.    The Tribe restates and realleges the allegations in paragraphs 1 through 19 as though fully set forth herein.

145.    The Tribe conducts economic activities on Tribal Land that are related and ancillary to its gaming operations, including operating restaurants, bars, retail shops and live entertainment venues at the same entertainment facilities in which the gaming activities are conducted. These amenities are provided for, and are patronized almost exclusively by, the Tribe's gaming patrons.  The Tribe uses utilities services to conduct these activities. For example, it uses electricity to air condition, light and power the equipment in those portions of its entertainment facilities in which these activities are conducted. Electricity is also used to air condition, light and power the equipment in the governmental offices in which these activities are administered.

146.    The federal law that regulates Indian gaming, including the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 and 25 C.F.R. Parts 286-293, 501-585, also preempts state taxation of economic activities that are related and ancillary to Indian gaming. Other federal law that regulates gaming-related economic activities include the Native American Business Development, Trade Promotion, and Tourism Act of 2000, 25 U.S.C. §§ 4301-4307 (Chapter 44); the Indian Financing Act of 1974, 25 U.S.C. § 1451-1544 (Chapter 17); 25 C.F.R. Part 286; the Native American Programs Act of 1972, 42 U.S.C. § 2991-2994 (Chapter 32); and 45 C.F.R. Part 1336.

147.    The Utilities Tax interferes, and is incompatible, with the federal and tribal interests reflected in the federal regulation of the Tribe's gaming-related economic activities, including tribal self-determination, economic self-sufficiency and strong tribal governments, by increasing the cost of conducting those activities.

148.    The State provides no services in connection with the Tribe's gaming-related economic activities.

149.    The Tribe adds significant value to the goods and services that are provided in connection with its gaming-related economic activities through activities that the Tribe conducts on Tribal Land.

150.    As applied to utilities services that the Tribe uses to conduct gaming-related economic activities, the Utilities Tax is preempted by federal law.

151.    The Tribe is entitled to a declaratory judgment that the application of the Utilities Tax to utilities services that the Tribe uses to conduct gaming-related economic activities is prohibited by federal law because it has an actual, present and practical need for the declaration; the declaration deals with a present, ascertainable set of facts and a present live controversy as to those facts; the Tribe has a legal right which is dependent on the relevant facts and law; the Tribe has an actual, present, adverse and antagonistic interest opposite the Executive Director as the official whose duty it is to collect and enforce the collection of the Utilities Tax.  Accordingly, this matter is properly before the Court, and the Tribe is not merely seeking an advisory opinion.

152.    The Tribe is entitled to injunctive relief because the Executive Director will continue to impose and collect the Utilities Tax on utilities services that the Tribe uses to conduct gaming-related economic activities on Tribal Land.

WHEREFORE, the Tribe demands that the Court enter a judgment against the Executive Director as follows:

a.    Declaring that the application of the Utilities Tax to utilities services that the Tribe uses to conduct gaming-related economic activities is prohibited by federal law;

   b. Enjoining the Executive Director from the further imposition or collection of the Utilities Tax on utilities services that the Tribe uses to conduct gaming-related economic activities; and

   c. Ordering such other relief as the Court deems appropriate.

DATED this 22nd day of November, 2016.

     Respectfully Submitted,

     s/ Glen A. Stankee
     Glen A. Stankee, Esq.
     Andrew P. Gold, Esq.
     **AKERMAN LLP**
     350 East Las Olas Boulevard, Suite 1600
     Fort Lauderdale, Florida 33301
     Tel:  954-759-8972
     Fax:  954-847-5379
     Email:  glen.stankee@akerman.com
     Email:  andrew.gold@akerman.com

     *Counsel for Plaintiff, Seminole Tribe of Florida*